GWILLIAM LUMBER & COAL CO. v. EL MONTE SPRINGS CORPORATION et al.
OGDEN STATE BANK et al. v. SMITH et al.

No. 5603.   Decided August 15, 1935.   (48 P. [2d] 463.)

*DeVine, Howell & Stine,* of Ogden, for appellant.

*W. H. Reeder, Jr., Arthur Woolley,* and *Stuart P. Dobbs,* all of Ogden, for respondents.

WOLFE, Justice.

This is one of those cases where the lower court was asked from blurred evidence to fix the dead line from which the time to file a mechanic's lien began to run. There were two cases consolidated. The issues will better be revealed by a statement of the evidence than from any recount of the manner in which they were formed when the two cases were combined for trial.

On the 25th day of April, 1928, the defendants A. V. Smith and his wife mortgaged to the Ogden State Bank certain real estate owned by them to secure two notes for $10,000 each. Between that date and October 18, 1928, the Smiths conveyed the property to the El Monte Springs Corporation. On the 18th of October, 1928, the El Monte Springs Corporation mortgaged the same property to the Ogden State Bank to secure another note for $10,000. One of the suits involved in this case seeks to foreclose these two mortgages. The real estate mortgaged some time before February 1, 1928, contained certain buildings used in connection with certain hot springs for swimming and sanitarium purposes. The buildings burned down. On the last-mentioned date, A. V. Smith, in whose name, together with his wife, the property stood, commenced to clear away the old brick and walls preparatory to rebuilding. It was contemplated that a corporation would be formed to take over

the springs and run the business and that Smith would hold the property in his name, and in the meantime reconstruct the resort with the idea of turning it over to the corporation. Later, to wit, the 26th day of April, 1928, the incorporation papers were filed in the office of the county clerk of Weber county, but evidently the deed from Smith and his wife to the corporation was not executed until August 1, 1928, and not recorded until August 14, 1928. About the middle of March, 1928, actual reconstruction was started on the property. Between the middle of March and the 4th day of April, 1928, before the mortgages were made, A. V. Smith contacted the Gwilliam Lumber & Coal Company, a defendant in one suit and plaintiff in the other, in regard to the purchase of materials. Mr. Gwilliam of that company came up to the springs and talked with Smith. This was at the time "they were excavating, cleaning up and getting ready to rebuild." The evidence shows that the defendant lumber company agreed to furnish cement and lumber to "be used in the construction of the building" which Mr. Smith told Gwilliam "probably would be strung over a period of time." Smith had asked for a line of credit. The amount of credit was "set at somewhere between $1,500 and $2,000." "The deliveries were to be made from time to time as needed," and they "would be paid for as he could get the money and would pay for it as the job progressed." Smith testified that what materials would be needed would run from $4,000 to $5,000, but said he would not "let the account go over $1,500 to $2,000 at any time and will turn over the receipts as fast as the money comes in, as far as I can get ahold of it." This is substantially all the evidence in regard to the making of the contract.

Since the question which must be decided depends upon whether the evidence is to be interpreted as showing all of the materials furnished during 1928, 1929, and 1930 by the Gwilliam Lumber & Coal Company were furnished as a continuous account under one contract, or whether such materials were furnished under two or more contracts for two

distinct purposes, it will require a somewhat detailed narration of the remaining evidence. The lumber company started to deliver materials about April 4, 1928, which was before either of the two mortgages were made. They delivered during that year, up to November 21, materials to the amount of $5,830.30 upon which there was a balance due of $1,287.19 on the 26th day of November, 1928. During 1928 the highest monthly balance was $1,714.69, which was on October 30th. On May 3d, the top balance was $1,705.56; on May 17th, $493.41; on June 18th, $1,535.39; on June 30th, $639.35; on August 9th, $1,230.34. The balances at the end of any month do not at any time appear to have been more than $2,000, although there is no evidence of the daily balances. This fact is cited by the respondents in support of their contention that the construction contemplated was all made during 1928, because the construction contemplated the giving of credit to an amount between $1,500 and $2,000. It is asserted that the credit actually given squares up with the credit the parties had in contemplation when Mr. Gwilliam talked to Mr. Smith. On July 2, 1928, the resort was opened up for business. No new materials were ordered or delivered from the lumber company from November 21, 1928, until May 23, 1929, upon which date the order was placed. During 1929 there were $215.15 of materials ordered and the total payments were $141.82, the balance on the date of the last delivery of that year, December 7th, being $73.33 and not $35.87 as stated in the respondents' brief. It is this break between November 21, 1928, and May of 1929 which respondents contend is evidence to show that the materials were not furnished on a continuous account.

The appellant points out, however, that the reason for interrupting the construction during the cold weather was because of the steam from the hot springs coming into the locker room and buckling the unpainted lockers. Appellant further points out that Smith himself continued to improve the property during that interval. During 1930 the lumber company furnished more materials amounting altogether to

$209.67 upon which there were cash payments of $30.51. These materials were furnished from January 4, 1930, to March 21st of the same year. On March 21st there was a total balance in favor of the appellant of $1,539.68. The account had been kept on the books of the lumber company as a continuous one showing debits and credits from April 4, 1928, to March 21, 1930. After March 21st, the lumber company continued to furnish materials, but such materials were not included in the notice of lien. The notice of lien claiming $1,539.68 was filed on April 8, 1930. The lumber company claimed to be ahead of the mortgage for the whole of the balance of $1,539.68 on the theory that all of the material during the three years was furnished in pursuance of one contract made between Smith and Gwilliam on behalf of the lumber company and that, therefore, the lien attached as of the date when the lumber company commenced to deliver the materials, to wit, April 4, 1928.

The respondents contend that the last materials furnished under that contract were delivered on November 26, 1928, and that the later materials were furnished for a different purpose than that contemplated by the original contract between Smith and the lumber company; consequently, that the notice of intention to claim a lien for so much of the materials furnished in 1928 was filed too late; that the first materials furnished under this later account were delivered after the making of the last $10,000 mortgage to the bank, and hence was subsequent in time. The court took respondents' view and decreed a lien for only $597.19 with interest from March 21, 1930, and held such lien subject to the mortgage to the Ogden State Bank. The court allowed the claim of $942.49 with interest from November 26, 1928, until paid, being the difference between the total claim of the appellant of $1,539.68 and the $597.19, as a common claim against the receiver of the El Monte Springs Corporation. The lumber company appealed from this judgment.

Appellant cites the case of Fields v. Daisy Gold Mining Co., 25 Utah 76, 69 P. 528, 530, as controlling and in support of

its contention that the materials were furnished under one contract for a unit purpose. That case quotes from 2 Jones' Liens, §§ 1435, 1436, as follows:

Sec. 1435: "If a materialman begins to furnish materials for the erection or repair of a building without any specific agreement as to the amount to be furnished, but there is a reasonable expectation that further material will be required of him, and he is afterwards called upon from time to time to furnish the same, he is generally entitled to a lien as under an entire contract. In determining a particular case the character of the account, the time within which the work was done or the materials furnished, and the purpose in doing the work or furnishing the materials afford a proper ground for the presumption either that there was or was not an understanding from the commencement that the work should be done or the materials should be furnished whenever required. If the work was done or the materials furnished for separate and distinct purposes, or under distinct contracts or orders, though in executing one and the same contract with the owner, there is no presumption of a continuous account, and the right of lien must date from the time of doing the different jobs of work or furnishing the different parcels of materials. But if there was a continuous dealing and running account, and the work was done and the materials furnished at short intervals, and were appropriate to the condition and progress of the building, a presumption arises that it was understood from the beginning that the claimants were to do the work or furnish the materials for the construction of the building as the same should be required; and in such case the last item of the account is the date from which the limitation of the time of filing of the lien is to be taken."

Sec. 1436: "Where it is to be inferred from the evidence that all the articles furnished by a contractor for the construction or repair of a house or other improvement were furnished under one contract, it is immaterial that the furnishing of the articles may have extended over a long period, or that several months may have elapsed between two items of the account. Where it is specially agreed or impliedly understood between the parties that the account is to be kept open and continued as one and the same continuous transaction and course of dealing, the account will be considered as one continuous account and one demand."

As often, the law appears clear until the attempt is made to apply it to the facts or to interpret the facts in the light of the legal principles enunciated. What is a distinct and separate purpose? In the instant case, the purpose may have

been to build a first-class swimming resort and to do all those things necessary as revealed by time and experience over a course of years to make it such. Thus, improvements might have extended over the life of the resort. And again, the purpose at hand may have been to put the resort back to where it would be reasonably adequate to serve the public. From what has been recited of the evidence with regard to the contract between the lumber company and Smith, it is obvious that there is nothing very distinct as to what reconstruction was contemplated by that contract. We are driven then to consider

"the character of the account, the time within which the work was to be done and the materials furnished, and the purpose in doing the work or furnishing the materials."

The account, as far as the lumber company was concerned, was a continuous one in that it did not show on its face that it had ever been completed or closed. The reason it may not have been closed was that there may have been a balance owing or because it was thought that more materials would be ordered. The keeping of it open is as consistent with one theory as with another. There is a nebulous area of testimony concerning the nature of the purposes for which materials were ordered: Smith testified that during 1928 they laid the foundation, building the four walls of the building and the roof, but said that the building was not finished at that time and that considerable work needed to be done. There were

"some lockers that we contemplated building in the back and some walls for the protection from trees coming down the canyon and quite a little work on the outside of the pool that hadn't been finished then." "In 1929, we recemented the outside pools and as soon as the steam got out so we could work, we finished our board lockers we put in the back end. * * * It was almost impossible to work in there on account of the steam and water, so we put them in in the spring. They were section lockers back of the main pool."

The testimony is quite indefinite as to times when different jobs around the premises were done. And there are

apparent contradictions. The testimony also frequently uses the demonstrative adjectives "that" and "those" and the adverbs "here" and "there" without designating to what part of the building they refer, so as to make it difficult or impossible for any person reading it to know what is referred to. From what we can glean from the record of Smith's testimony, it does appear that in 1929 the outside pools were recemented and the board lockers were finished and put in the back end. In 1930 they

"started on the downstairs proposition where we later made it into a municipal golf course; that was cement work, putting in the new floors and getting these two large rooms in shape for municipal play there. Some work on the back of the main part of the building, but kind of fenced off somewhat from the back end there."

Smith speaks of having done eight hundred and some odd dollars worth of work in the spring of 1930 and in 1932 having put in "those" partitions, and putting in lath and plaster partitions between the pool room and the pool so that the steam would not get into the pool room. In 1931 the basement was finished ready for lockers for the golf players.

In looking over this testimony we are not able to say that the court, sitting as a fact finder, erred in interpreting the facts. Anything which was reasonably necessary to put the resort back where it could serve the public was probably in contemplation of the parties when they made their contract in April, 1928. Evidently it was in shape by July 2d to serve the public in some fashion, but there were lockers which had buckled to be replaced in 1929. It may be a fair deduction that the cementing of the pools and the building of the walks around them and the protecting wall from the trees brought down by the river and the cement floor were still parts of the original reconstruction contemplated. It may be just as fair a deduction that nothing was contemplated in the nature of improvements such as experience would reveal as desirable after the time when the building was so complete as to be reasonably adequate for serving the public. The difficulty under the evidence is to find out what construction

comes on one side or the other of this line. Certainly, the putting in of those lockers which were for golf purposes would not come in that category. Nor do we believe that partitions to keep the steam from coming into the pool room would be in that category. Evidently as far back as May, 1929, it was contemplated that the city might use part of the building for lockers. It was testified that the cement floor in the two large rooms was necessary to prevent the high water from the river from seeping in. It is doubtful whether such discovery later, after November of 1928, would come in under the construction contemplated by the parties under their agreement of 1928.

A review of this case convinces us that the question of whether all of the materials furnished over the three years were for a unit purpose contemplated in conversations between the parties in April of 1928, or whether for distinct purposes and under different contracts, as was the case in the action of *Cahoon* v. *Fortune Min. & Mill Co.*, 26 Utah 86, 72 P. 437, was a question of fact for the court. If we conceive of a theoretic point where the evidence would be evenly balanced between the parties in support of their respective theories, certainly the most that can be said is that the evidence in this case is not so convincing on one side or the other of that point as would permit the reviewer of the evidence to say that had the court gone either way in the interpretation of the evidence it would have been wrong. In such case the trial court should be sustained in its findings. We are inclined to believe that the evidence most strongly leans toward the conclusion that at least part of the materials furnished for reconstruction in 1929 were under the contract as reflected by the conversations between Gwilliam and Smith, but it is not evident that the materials furnished during the last part of 1929 and 1930 come under that contract. The court considered the first contract at an end with the materials furnished on November 21, 1928, and gave the appellant a lien for the remaining items after that time amounting to $597.19. If there were two or more con-

tracts instead of one whole contract or if it could not be considered as furnished on a continuous account for one unit purpose and the break between the first and the later contracts should have been set as coming later than November 21, 1928, it would still not help the appellant because it would only shake off from the lien more of the items which were included by the court in the lien claim without in any way permitting the remaining items to be tacked on to the former items furnished in 1928 for the purpose of referring all of the deliveries back to the commencement on April 4, 1928.

It was held in the case of *Gerard B. Allen & Co.* v. *Frumet Min. & Smelting Co.*, 73 Mo. 688, that items furnished for repairs

"come fairly within a continuing agreement to furnish whatever shall be required in the way of fixtures and machinery for a manufacturing establishment; and they may properly constitute a part of an account filed for a mechanic's lien."

In this case, however, the repairs were made in the course of the completion and construction of the plant. It was not like the Cahoon Case. In the case of *Choteau* v. *Thompson & Campbell*, 2 Ohio St. 114, at page 126, it was held that:

"Where materials are furnished, from time to time, for a particular purpose, as, for instance, the construction of a house, and the dates are so near each other as to constitute one running account, the lien dates from the time when the first article was supplied, although, strictly speaking, the articles were not furnished under one entire contract.

"But where they are furnished for different purposes, as, for instance, a part of them for constructing a house and the *residue at a subsequent time, for altering or repairing it,* or where there are intervals of time in the account so long that it cannot, with propriety, be called *one* account, there is not, in the absence of an entire contract, a lien for the whole from the date of the first article furnished. The items must be regarded as constituting two, or more, distinct accounts, as the case may be; as, for instance, the materials supplied for constructing the house as making one account, those subsequently furnished for repairing it, as forming another; or those supplied before the supposed interval of time, as constituting one account, and those subsequently furnished, as another. * * * We do not, however,

mean to say, that where alterations and repairs are going on, at, or about, the same time, the account must be divided. Nor that there must be a division where the alteration or repairs are made *immediately* after the erection, so as to plainly constitute but one account." (Italics supplied.)

It was held in the case of *Trustees of German Lutheran Evangelical Church* v. *Heise*, 44 Md. 453, at page 469, that:

"The account, as stated and filed with the claim for lien, and which is proved to be correct, shows that the materials were continuously furnished within the period stated, during the progress of the building. The items are very numerous, and deliveries were made at short intervals of a few days, as the materials were wanted at the building; and this course of dealing continued during the entire period covered by the account."

In cases of this type it is not difficult to lay down an abstract rule of law, but quite difficult sometimes to apply it, and especially when the evidence is as confused as it appears to be in this case. The one outstanding rule is that each case must be decided on its own circumstances and on its own evidence. All we need say in this case is that we are convinced that the conclusion of the lower court is within the reasonable limits within which conclusions may vary without this court saying that they are wrong.

The judgment of the lower court is therefore affirmed, with costs to the respondents.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.