FREDERICK CHARLES BACK ET AL. *v.* THE
REISTERSTOWN LUMBER COMPANY

[No. 155, September Term, 1974.]

*Decided February 13, 1975.*

The cause was argued before ORTH, C. J., and POWERS and MOORE, JJ.

*B. Conway Taylor, Jr.*, and *Robert M. Wright*, with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellants.

*W. Lee Harrison*, with whom was *Cooper C. Graham* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

This case, involving lien claims for building materials and supplies, arose out of the subdivision of a small parcel of real estate located at Hunt Road and Denby Road in Baltimore County and its development into seven improved lots. An appeal was taken from a decree of the Circuit Court for Baltimore County (Maguire, J.) ordering enforcement of lien claims for building materials and supplies against Lot 4, owned by appellants Back; Lot 5, owned by appellants Culotta and Lot 7, owned by appellants Mott.[1] The appellants have paid the contractor for the materials and supplies. Their exposure to the lien claims of the supplier results from the forgery of the supplier's signature to releases of liens.

On behalf of all appellants, it is contended that the supplier, the Reisterstown Lumber Company, may not claim entitlement to liens for items furnished prior to ninety days from the dates of its written notices of lien claims given pursuant to the Mechanics' Lien Law then in effect, Art. 63,

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, May 23, 1975.

1. They are husband and wife in each instance. Suits to enforce the liens against Lots 4 and 5 were filed on January 22, 1969 and against Lot 7 on April 17, 1969. The cases were not consolidated and tried until November 5, 1973.

§ 11 (a).[2] In addition, on behalf of appellants Culotta only, it is argued that Reisterstown failed to prove *delivery* of certain materials on August 21, 1969, within the above ninety day period.

I

The entire parcel was originally owned by the appellants Mott. Prior to 1967 Mr. and Mrs. Mott decided to subdivide the land, to retain one lot for their own residence and to sell the others. Mr. Mott, a registered professional engineer, entered into a "50-50 partnership" with one John E. Wiser for the construction and sale of houses on the other lots. Both partners were engaged full time in other employment. Mr. Wiser was to handle advertising, selling and financing; Mr. Mott prepared the plans and specifications. The venture engaged as builder the firm of Winter Construction Co., Inc., of which Walter R. Winter, then 33, was president. The partners had known Mr. Winter for three or four months before signing an agreement with him for the construction of a house on Lot 3 in late May, 1967 and were familiar with his construction work in the nearby area. Each of the houses was to be custom built. The prospective buyer would first acquire title to the lot and obtain his own construction loan. Thus the partnership put up no funds for construction, its only expense being for engineering and surveying. For each house, a construction agreement was entered into between Mott and Wiser as "Developer" and Winter Construction Co., Inc. as "Contractor." When work was commenced on the first house (Lot 3) there was no purchaser. The house was bought, however, when half-completed and was then finished to the purchaser's requirements. Thereafter, there was no predetermined schedule of construction. As Mr. Mott explained in response to a question from the chancellor:

> "A. We normally, we were overlapping at the end of one — if I might answer it this way, Your

2. Repealed by Acts 1972, Ch. 349, § 1, effective January 1, 1973. For new section containing provisions similar to those of §§ 11 and 12 of Art. 63, *see* Real Property Article, § 9-103.

Honor, we were overlapping finishing one house and starting another. We had no set schedule. We were completely dependent upon when our client showed up."

The eventual sequence of construction was as follows, the dates being the dates of commencement, not completion:

Lot 3—May, 1967
Lot 2—October, 1967
Lot 1—December, 1967
Lot 5—March, 1968
Lot 4—May, 1968
Lot 7—July, 1968

Winter Construction Co., Inc. received its final draw payment for each house upon presentation of a mechanic's lien release sheet, as required by the respective lenders. In November, 1968 the partnership and the home purchasers became aware of claims of Reisterstown Lumber Co., Inc. for unpaid deliveries of materials and supplies in fairly substantial sums. The president of Reisterstown, Charles R. Forbes, Jr., characterized as forgeries the signatures on behalf of his company appearing on the releases of liens. Mr. Winter could not be produced as a witness at the time of trial and the court received in evidence, at the instance of the appellants, his deposition taken on February 7, 1969.[3]

The material delivered by Reisterstown to the three properties in question together with the relevant dates, according to the supplier's records and contentions, may be tabulated as follows:

---

**3.** Mr. Winter at his deposition was directed by his counsel not to answer a question as to whether he had any knowledge of "any mechanic's lien releases being furnished on any of those properties."

|                                        | Lot 4 (Back) | Lot 5 (Culotta) | Lot 7 (Mott) |
| -------------------------------------- | ------------ | --------------- | ------------ |
| Date of first delivery                 | 5/3/68       | 3/36/68         | 7/2/68       |
| Date of last delivery                  | 9/16/68      | 8/21/68         | 11/1/68      |
| Date of Notice                         | 11/18/68     | 11/13/68        | 1/9/69       |
| Total claimed (less interest)          | $1,073.25    | $7,563.59       | $9,135.22    |
| Amt. in 90-day period prior to Lien Notice | $ 116.66 | $14.36          | $1,316.94    |

Appellants Back and Mott do not contest the fact of delivery pursuant to the lien notice. Appellants Culotta, however, deny that the last delivery in the amount of $14.36 on August 21, 1967 was in fact madé. (The next preceding delivery to the Culottas was on August 9, 1968 and was thus outside the statutory ninety day period.) It is the position of *all* appellants that the liens properly attach only for specific deliveries made within ninety days of the lien notice, in the amounts above tabulated, and not for all prior unpaid deliveries. The chancellor concluded that the latter contention was unsupportable and that the delivery of the materials to the Culottas on August 21 had been established. He therefore decreed that the respective liens be enforced. For the reasons hereafter stated we do not find error. Maryland Rule 1086.

## II

The issues raised call for a construction of Section 11 of the Maryland lien law which provides that if "the contract" for furnishing materials is made with any person except the owner of the lot on which the building may be erected, the supplier shall not be entitled to a lien unless, within ninety days after furnishing them, he shall give notice in writing to the owner of his intention to claim a lien.[4] "The purpose of

---

4. For a discursive analysis of the Statute, *see* "The Maryland Mechanics' Lien Law — Its Scope and Effect," 28 Maryland Law Review 225 (1968). "In 1791 Maryland enacted the first mechanics' lien law in the United States," the authors state in the opening sentence. The Court of Appeals in T. Dan Kolker, Inc. v. Shure, 209 Md. 290, 121 A. 2d 223, *infra* observed that "the mechanic's lien law was passed to protect material men. This Court has laid down the rule that it is to be construed in the most liberal and comprehensive manner in favor of mechanics and material men." (p. 296) (citations omitted.)

this notice is to inform the property owner of the nature and amount of the claim intended to be fixed as a lien upon his property, in order that he may be able to protect himself in his future dealings with the contractor." *District Heights Apartments v. Noland Company, Inc.*, 202 Md. 43, 95 A. 2d 90 (1953).

The principal controversy involving the parties (including the Culottas) centers on the fact that, as shown by the tabulation above, most of the materials and supplies were delivered to each of the sites more than ninety days prior to the dates of the respective notices of intention to file liens. In essence, the three appellants contend that each order and delivery constituted a separate "contract" as that term is employed in Section 11 and, therefore, that the lien claims must be limited to the amount of materials delivered in the 90-day period prior to the notice.[5] Reisterstown Lumber, on the other hand, contends in effect that there was a single open account contract and that the notices reach *all* the deliveries because they were given within ninety days from the *last* delivery to each site.

The factual context in which the resolution of these issues must be made is further reflected in the following tabulation of orders and deliveries to the respective sites based upon the lien claims and the particulars thereof:

|  | Lot 4 (Back) | Lot 5 (Culotta) | Lot 7 (Mott) |
|---|---|---|---|
| Orders | 44 | 57 | 41 |
| Deliveries | 37 | 42 | 37 |
| Delivery Dates | 5/3/68-9/16/68 | 3/28/68-8/21/68 | 7/2/68-11/1/68 |
| Total Invoices | $6,480.47 | $7,563.59 | $9,135.22 |

These orders and deliveries were not made pursuant to an express contract. The evidence before the chancellor concerning the arrangements between the supplier and the builder may be summarized as follows:

1. A sales representative of Reisterstown for more

---

5. Appellants Culotta, as previously stated, also contend that no materials were delivered within the ninety day period.

than 25 years, Mr. Jacob M. Hundertmark, called upon the builder, Mr. Winter, at the construction site of Lot No. 3 (the first to be improved) when the builder had completed only the foundation work. In this way, the relationship between the supplier and the builder presumably began.

2. The evidence was conflicting as to whether estimates were supplied by the lumber company and if so, their number and extent. According to the deposition of the builder, there was at least one estimate. The president of the company did not recall any estimates. The salesman, Mr. Hundertmark, testified that he prepared several estimates for building materials which Reisterstown could supply. The estimates, he testified, included lumber, millwork, roofing, flooring and insulation. Estimates were not given for all of the houses, he testified, because "Mr. Winter said he was satisfied with our material and prices and our delivery."

3. Orders for materials and supplies were given by the builder on an average of twice each week, either to the salesman at the job site or by telephone call to him at the company's offices or at the salesman's home. According to Mr. Winter's deposition, he called Reisterstown "practically every day." He also ordered from other suppliers but "mostly I called Reisterstown...."

4. The orders would be designated at the offices of Reisterstown by lot number for the respective homes and deliveries were made usually on the day the order was received, trucked to the site by the lumber company.

5. The contractor was given wholesale or builders' prices and was billed on open account once each month. As shown by the particulars, the items

sold fell into the category of building materials, hardware and millwork.

6. Less than all the materials and supplies required for the construction of the several houses came from Reisterstown Lumber Company. The builder was free to purchase from other suppliers and did so. According to the testimony of the salesman, however, Reisterstown provided "the majority" of the building materials which went into the houses constructed on Lots 4, 5 and 7.

7. Most of Reisterstown's supply business was done without an express contract.

The leading case involving the meaning of the term "contract" in Section 11 of the lien law is *Trustees of the German Lutheran Church v. Heise*, 44 Md. 453, decided by the Court of Appeals in 1876 in an opinion by Judge Alvey. The chancellor in the instant appeal took careful note of the pronouncements of the Court in *Heise*. With respect to the meaning of the term contract, the Court of Appeals there stated (p. 469):

"The lien law, Code, Art. 61, secs. I, II, speaks of the *contract* for furnishing work or materials to the builder, or other person than the owner; but we do not understand from this that it is incumbent upon the claimant to establish the fact that there was an *express* antecedent contract made with respect to the exact quantity of work or materials to be done or furnished by him." (Italics in original.)

Immediately thereafter the Court set out the following standards to be applied in the absence of evidence of an express contract:

"In the absence of evidence of such express contract, the character of the account, the time within which the work was done or the materials were furnished, and the object of the work or materials, may afford

proper grounds for *the presumption* that the work was done or the materials were furnished with reference to an understanding from the commencement that such work or materials should be done or furnished, if required by the builder; *and in such case, it is from the last item in the account that the notice, and the time within which to take the lien, should date.* If this were not so, in every case where there is no express contract, the mechanic or material man would be under the necessity of taking several liens during the progress of a single building." (Emphasis added.)

Further, the Court in *Heise* delineated the circumstances where the above presumption did not arise (p. 470):

"But where the materials are furnished for separate and distinct purposes, or at different times, and at considerable intervals, or under distinct contracts or orders, though to be used by the contractor or builder in executing one and the same contract with the owner, no such presumption will arise, *and the right to take the lien must date from the time of furnishing the different parcels of material, and not from the last item in the account.*" (Emphasis added.)

In *Heise*, the Court had before it the bill to enforce a lien by Heise and Company, the supplier of the lumber used for the construction of the church. (The proceedings were consolidated with a bill to enforce the lien claim of a partnership which furnished the bricks.) The Court rejected the argument that the lumber was not furnished under a continuous contract and concluded that the court below was correct in regarding the lien as established. The language of the Court of Appeals in reaching this conclusion casts further illumination on the question before us:

"In this case, there was such a continuous dealing, and running account of the materials furnished, and the deliveries were at such short in-

tervals, and in such quantities, that the presumption arises that it was understood from the beginning that the claimants were to furnish the materials charged for as they were required in the progress of the building. And this presumption, we think, upon a fair construction of the evidence, is not overcome or removed by anything stated either in the testimony of William Heise, or his witness, J. G. Jones." (p. 470).

In the instant appeal, there was also continuous dealing, a running — on open account — for the materials furnished, and the deliveries were at short intervals, over a period of four to five months when the construction of the three houses overlapped. This is shown in the suppliers' records which are impeccably detailed. And, of course, in each instance and for each lien claimed, the materials were furnished for the same general purpose — the building of each house. It is true, as appellants emphasize, that the contractor was free to purchase elsewhere and did so. The Court of Appeals has held, however, in a case subsequent to *Heise,* that it is not incumbent upon the lienor to show that the agreement with the general contractor was entire and indivisible or that there was an intention from the beginning to furnish *all* the material that would be required by the contractor. *Caltrider v. Isberg,* 148 Md. 657, 664, 130 A. 53 (1925).

We find entirely proper the chancellor's application of *Heise* and also his reliance upon *Humphrey v. Harrison Bros., Inc.,* 196 F. 2d 630 (4th Cir. 1952) decided under the lien law of Maryland. Appellants mistakenly maintain in their brief that *Humphrey* involved an express understanding between the supplier and the builder. The opinion of Judge Soper, writing for the Court, makes it abundantly clear that the only formal contract was between the plumbing and heating subcontractor (Alexander Green) and the owner and builder (James Humphrey). Prior to the execution of that contract "Green arranged" with the supplier (Harrison Bros.) to purchase the necessary material

to perform his contract with Humphrey and 90% of the supplies required for the job were actually purchased from Harrison, the supplier. The arrangements between the subcontractor and the supplier were thus described by Judge Soper:

> "Prices were named by Harrison at the beginning of the operation but there was no written or oral contract between Harrison and Green fixing the prices or binding the parties to a sales agreement for the entire project; and the goods were bought on open account as needed during the ensuing months, and payments on account were made from time to time."

The Court found that the lien for furnishing of plumbing supplies was enforceable.[6]

We apprehend that the appellants, in their assertions of error on the part of the chancellor, fail to distinguish between a regular course of dealing between a supplier and a contractor, as exemplified in the instant appeal and cases like *Humphrey, supra,* and situations where separate and distinct contracts were entered into. A graphic illustration of the latter is the case of *Clark v. Boarman,* 89 Md. 428 (1899) where a dwelling was erected under one contract for the sum of $1400 and, under another agreement, four outhouses were constructed at a cost of $200.50. The Court of Appeals held that these were distinct contracts and that, in such case, the material man was not entitled to a lien under both contracts by simply accounting from the date of the last item of one of them and, in all respects, the requirements of the lien law had to be observed as to each contract.

In another early case, a material man entered into an

---

6. As Judge Soper pointed out, the "more important question" in the case was whether the lien was invalid because the materials were not installed in the houses against which the lien was asserted but in other houses in the project. The Court held that where materials are furnished to a number of houses in a single project, it is not essential to the validity of the lien claims that the supplier show in what houses the specific materials were used.

agreement to supply bricks at the prices of $9.00, $17.50 and $25.00 per thousand for the construction of twenty houses, with no definite quantity being stipulated. Deliveries were made from November to May and once again in August. In May, however, bricks were ordered for paving purposes at a different price, namely, $10.00 per thousand. The Court of Appeals held that the paving bricks were furnished under a separate contract whereas all the others were supplied under one continuous contract and the paving bricks were not allowed as part of the lien claim under the earlier agreement. *The Maryland Brick Company of Baltimore City v. Dunkerly*, 85 Md. 199 (1899); *see also Watts v. Whittington*, 48 Md. 353 (1878).

We conclude also that the appellants have misread the cases of *Hensel v. Johnson*, 94 Md. 729 (1902) and *Brunt v. Farinholt Company*, 121 Md. 126 (1913), upon which they rely in support of their contention that each order and delivery in the instant case constituted a distinct contract and that the lien is governed by the respective dates of delivery and not from the last item in the account.

*Hensel* also arose on a bill to enforce mechanics' liens. As the opinion of Page, J. discloses, the record developed an enormous amount of evidence. In a relatively brief disposition of the case, however, the Court succinctly set forth the facts relating to the lien claims of some ten mechanics and/or suppliers who were involved. Appellants in their brief refer to the tenth claim only. This was the claim by the firm of Myohl & Luken for the lumber supplied in the construction of five houses located in Baltimore County. The original undertaking of the lumber firm was to furnish "not such lumber as might be needed for the construction of the houses *but a specific quantity contained on a list, a copy of which is in the record.*" (Emphasis added.) These specific quantities were to be supplied at a stated price of $1487.45. Thereafter, the builder purchased more lumber and, in the language of the Court, "not by virtue of the original agreement, but as he needed it." In our view, the following language of the Court is at variance with the position advanced by appellants in this case: "The lumber

furnished in addition to the kinds and quantities included in that list was as much under a separate contract as was the lumber furnished by the firm to Eckstine (the builder) for other work that the latter was then conducting." (p. 736). In other words, the Court is speaking of two separate contracts rather than the "list" contract and multiple separate contracts for additional lumber ordered as needed. This interpretation of the opinion is supported by the Court's disposition in *Hensel* of the very first claim considered by the Court in that case, that of Pearson & Co., 94 Md. at p. 732. An objection to the latter's claim for hardware supplied to the site was thus expressed in the opinion of the Court (p. 732):

"It is contended that there was no contract verbal or written under which the materials were furnished and that the claim is not effective as to materials delivered more than thirty days before the service of the notice."

Rejecting this contention, the Court stated in language appropriate to the instant appeal:

*"The proof shows that there was an understanding between Eckstine, and Pearson & Co., that the latter should furnish such hardware as would be needed in the construction of the houses, and it also appears that the several items of the account were furnished continuously and at short intervals as the materials were wanted at the building. Under these circumstances it must be presumed that they were furnished in accordance with the understanding originally existing between the parties, and it is therefore from the last item in the account that the notice, and the time within which to take the lien must date. Trustees of the German Luth. Ch., &c., v. Heise & Co., 44 Md. 469."* (Emphasis added.)

With respect to *Brunt v. Farinholt, supra,* appellants rely upon that portion of the case (a consolidated appeal also involving three lien claims) which related to a decree against

the house of Henry Brunt. The bill of particulars contained items furnished from July 2, 1910 to October 26, 1910 amounting to $634.64 and a charge on October 29 for $8.29. Notice of an intention to file a lien was served on December 21, 1910. Mr. Brunt conceded that the supplier was entitled to a lien for items furnished from October 5 to October 26 but contended that items delivered prior thereto were not "furnished under the same contract or understanding between the [supplier] and the contractors" and therefore as to such items the notice was not timely.

The Court of Appeals concluded that the decree should have included only the items delivered in October. The crucial factor in the Court's decision was that the builder, after the Brunt house was more than half completed, asked for and received from the supplier a bid dated October 1, 1910 for a list of materials which amounted to $252.64. These items were delivered to the Brunt site beginning on October 5. Testimony quoted in the opinion of the Court reveals that all prior deliveries had been made on separate orders without any similar "estimate" or other writing. The Court made a finding that "the materials furnished in October were furnished under a separate and distinct contract from the *arrangement* under which those delivered prior to October 5 were furnished." (Emphasis added.) The Court did not find, as appellants have implied, that the pre-October 1st "arrangement" consisted of a number of separate and distinct contracts. Rather, the Court made the following analysis:

"The articles delivered during the month of October were furnished under the contract of October 1st, *and if it be conceded that as to those delivered prior to that month the presumption spoken of in paragraph (2) of what we have taken from 44 Md., supra, would arise,*[7] *they were furnished under a*

7. The reference here is to a prior paragraph in the Court's opinion quoting the standard set down in *Heise, supra,* as follows:

"(2) In the absence of evidence of such express contract, the character of the account, the time within which * * * the

*different contract from that under which those in October were furnished.* What is said of the claim of *Myohl & Luken* in *Hensel v. Johnson,* 94 Md. 729, is very applicable to this claim." (Emphasis added.)

The Court's assumption negates the inference drawn by appellants that the pre-October deliveries were necessarily under separate contracts.

In addition, we find appellants' attempt to distinguish the case of *T. Dan Kolker, Inc. v. Shure,* 209 Md. 290, 121 A. 2d 223 (1956), unavailing. The case involved an appeal from a decree granting enforcement of part of a material man's lien pertaining to millwork, and denying enforcement of the remainder pertaining to rough lumber. There, a written contract for the millwork in the amount of $2,587.51 for the construction of a private house in Baltimore County was entered into between the builder, Mr. Miller, and the supplier, Mr. Kolker, on October 30, 1953. At or about that time, the builder and supplier discussed the rough lumber requirements for the job. Miller testified that he agreed to buy the rough lumber from Kolker only if the prices "were right." Miller felt free to call on other suppliers, and did so, but testified that "Kolker always got first preference" because of the arrangement on the millwork. Both the millwork and the rough lumber were carried as a single account on the invoices and on Kolker's books. Deliveries of rough lumber spanned a period from January until May, the last delivery being on May 24 — within the then 60-day statutory period required for a notice of intention to file a lien. As disclosed in the opinion of the Court (Collins, J.), the rough lumber deliveries, far fewer in number and much less frequent than in this case, were as follows:

---

materials were furnished, and the object of the * * * materials may afford proper grounds for the presumption that the * * * materials were furnished with reference to an understanding from the commencement that such * * * materials should be * * * furnished if required by the builder."

| January | 5, 6, 24, 28 |
| February | 4, 15, 17, 24 |
| March | 8 |
| May | 24 |

Applying the rules contained in *Heise* the Court concluded that the chancellor erred in not holding the mechanic's lien valid as to the rough lumber as well as the millwork: "[A]s all the rough lumber was furnished for the same purpose, the construction of the Shure home, and even though it was delivered at different times, these deliveries were so connected together to show that the parties contemplated that all of the deliveries formed one entire matter for settlement." [8] It is to be noted that the Court in *Kolker* applied the standard set out in *Heise* for a single contract and specifically found *inapplicable* the following qualification in *Heise*:

> "'But where the materials are furnished for separate and distinct purposes, or at different times, and at considerable intervals, or under distinct contracts or orders, though to be used by the contractor or builder in executing one and the same contract with the owner, no such presumption will arise, and the right to take the lien must date from the time of furnishing the different parcels of material, and not from the last item in the account.'"

The Court in *Kolker* also relied — as did the chancellor in this case — on the case of *Humphrey v. Harrison Bros., Inc.*, 196 F. 2d 630 (4th Cir. 1952), *supra*, and quoted the following language from the opinion of Judge Soper, 196 F. 2d at p. 635:

---

8. The Court's holding did not require it to decide whether the lumber and millwork together constituted one contract since, as it stated: "The requirements of the statute are satisfied whether deliveries are treated as made under a separate contract for the rough lumber, or under a single contract for the millwork and rough lumber as the parties apparently regarded it."

"It is not necessary that there be a binding contract between the contractor and furnisher for all the materials if the parties in their dealings with each other treat the project as a single enterprise and the goods are delivered continuously as needed during the building operation."

Finally, the chancellor correctly rejected appellant's claim that *United States v. Allied Contractors, Inc.,* 171 F. Supp. 569 (D.C. Md. 1959) and *Noland Co. v. Allied Contractors, Inc.,* 273 F. 2d 917 (4th Cir. 1959), reversing the case first cited, support their position. The litigation there involved was under the federal Miller Act [9] and we are not bound by nor do we indeed concur in the interpretations in those cases of *Heise* and *Farinholt.*[10]

In sum, it is our conclusion that there were sufficient facts before the trier of facts upon which a judgment could be made that there was an understanding between Reisterstown and Winter upon the commencement of construction of these houses from which the builder's purchases from Reisterstown derived. These facts included, as in *Heise,* the character of the account, the time and frequency within which the materials were furnished, their

---

**9.** 40 U. S. Code, § 270 a providing that one who has furnished labor or material in a contract for the construction of a public building and has not been paid in full within ninety days after the date on which the last work was done or materials furnished, shall have the right to sue on the payment bond for the unpaid balance and providing that any person having direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor shall have the right of action on the bond after giving written notice to the contractor within ninety days from the date of the last performance or last delivery. In the cases cited, the principles of the *Heise* case were applied at the trial level by District Judge Watkins but were found not controlling by the Circuit Court of Appeals.

**10.** In the District Court opinion we find inaccurate the statement that the Court of Appeals held in the *Farinholt* case that "unless there is a continuing contract to furnish materials on a project, notice must be given within (then 60 but now) 90 days of furnishing material under each separate order." In addition, the opinion of the Court of Appeals in *Noland* expresses incorrectly (p. 919-920) the *ratio decidendi* of *Heise* when it states that in the construction of the mechanics' lien law of Maryland "emphasis was laid upon the term *contract* between the builder and the supplier of materials and the notice was held to run from the completion of each distinct contract or order." As we have previously noted herein, the holding in *Heise* was quite to the contrary.

quantity, and the purpose for which the materials were used; and therefore it is from the last item in the account that the notice and the time within which to take the lien should date. As the Supreme Court of Utah had occasion to state in *Gwilliam Lumber and Coal Co. v. El Monte Springs Corp., et al.*, 48 P. 2d 463 (1935), an appeal involving priority between a mechanic's lien and real estate mortgages: "The one outstanding rule is that each case must be decided on its own circumstances and on its own evidence." In this case, not only was the chancellor not clearly erroneous, Maryland Rule 1086; his finding on these contentions of the appellants, considered above, was amply supported.

## III

Appellants Culotta complain that the trial court made no finding on the controverted issue of delivery *vel non* of materials to their lot valued at $14.36 on August 21, 1968; and they contend that the evidence produced by Reisterstown was insufficient to establish a *prima facie* case of delivery "or to support a finding of delivery by the trial court." While we note that the learned chancellor stated in his memorandum opinion that the "pertinent dates . . . are not at issue," he immediately thereafter added: "Mr. Charles Forbes, President of Reisterstown Lumber Co., testified as to the above dates without contradiction from the defendants." Upon our review of the record, we find this statement of the chancellor amply supported. First, during the direct examination of Mr. Forbes, two printed "Delivery Receipt" forms, one for the delivery of four pieces of sheet rock and the other for two window screens, each bearing the signature "W. Winter," and each inscribed "delivered August 21, 1968 by Richard Forbes" (identified as the son of the president), together with the "truck log" of Richard Forbes, were received in evidence as records kept in the regular course of business, Code, Art. 35, § 59. These papers constituted *prima facie* evidence of the facts stated.[11]

---

11. The same records for other deliveries had previously been received in evidence without objection, as the chancellor observed in overruling the objection of the appellants to the August 21 delivery receipts.

Mr. Culotta did not deny the August 21 delivery date. On direct examination he testified that the invoices above described "don't ring any bell to me. I am not home during the day, like most of us are not, so I can't say positively one way or the other, but they don't ring any bells to me as to any materials that we needed to complete our house at that time, because that is August 21st, well over a month after we took occupancy of the house." Thereafter, the witness admitted that a basement bathroom was constructed after the family moved in and that sheet rock was used to enclose the shower, although he believed that the work was performed within days rather than weeks of the family's occupancy of the house.

The questions of credibility presented here were, of course, for the determination of the chancellor. *Felder v. State*, 6 Md. App. 212, 250 A. 2d 666 (1969); *Ritter v. Danbury*, 15 Md. App. 309, 290 A. 2d 173 (1972). The answer to appellants' contentions that Reisterstown should be required to produce "direct testimony" of the date and fact of delivery, especially because "a minor delivery in the amount of $14.16 opens up a claim of $7,563.59, under circumstances which make the date and fact of delivery suspect," is found in the opinion of Judge Delaplaine writing for the Court of Appeals in *District Heights Apartments v. Noland*, 202 Md. 43 (1953), *supra:*

> "It is an accepted rule that where a plaintiff has established a *prima facie* case, and the defendant seeks to support his defense by facts which are or ought to be within his knowledge, the burden shifts to him. So, while the burden is on the material man in a mechanic's lien case to establish the fact that he delivered the materials for which he claims the lien, it will be presumed that all materials which he shipped to the defendant were duly delivered, in the absence of some direct evidence to the contrary. In the case before us no evidence was produced to contradict the *prima facie* evidence that the materials as ordered and charged had been delivered to the defendants."

And the following statement of the law thereafter expressed in *Noland* (p. 52-53) is strikingly appropriate here:

> "It is also firmly established that where the time allowed for filing a mechanic's lien has begun to run, the claimant cannot thereafter extend the time within which the lien may be filed by doing or funishing small additional items and thereby fixing a date from which the period must begin to run anew, especially where the doing or furnishing of such items is merely colorable and the real intention is to save or restore a right which is already imperiled or lost, or where the additional work is done or additional materials are furnished without the knowledge, request or consent of the owner. But where a claimant, after a contract is substantially completed, does additional work or furnishes additional material which is necessary for the proper performance of his contract, and which is done in good faith at the request of the owner or for the purpose of fully completing the contract, and not merely as a gratuity or act of friendly accommodation, *the period for filing the lien will run from the doing of such work or the furnishing of such materials, irrespective of the value thereof.*" (Emphasis added.)

Here the invoices disclosed the job site, the date of delivery and the signature of the builder. The truck log of the driver disclosed the delivery of the order to Lot 5, the Culotta lot. There was at least one other delivery to the Culotta home in August — on August 9 — which they did not challenge. When called to testify,[12] Mr. Culotta could not contradict the delivery of the materials. We are unable to find on this record that the chancellor was clearly erroneous in rejecting the contentions of the appellants Culotta that the August 21, 1967 delivery of materials had not been made.

*Judgments affirmed; appellants to pay the costs.*

---

12. Mr. Culotta stated that he was present in court as an "observer" and was apparently unaware that he would be called as a witness.