**SOUTHERN STEEL COMPANY, INC.,**
**Plaintiff–Appellant,**

v.

**UNITED PACIFIC INSURANCE**
**COMPANY, Defendant–Counter-**
**Defendant, Appellee.**

No. 90–8795.

United States Court of Appeals,
Eleventh Circuit.

July 15, 1991.

David R. Hendrick, Hendrick, Spanos, and Phillips, Scott K. Tippett, Victoria H. Tobin, Atlanta, Ga., for plaintiff-appellant.

S. Gregory Joy, Smith, Currie & Hancock, Hubert J. Bell, Jr., Atlanta, Ga., for defendant-counter-defendant, appellee.

Before JOHNSON and COX, Circuit Judges, and GODBOLD, Senior Circuit Judge.

PER CURIAM:

Southern Steel Company sued United Pacific Insurance Company as surety on a payment bond required by the Georgia counterpart to the federal Miller Act, O.C. G.A. Section 13–10–1, *et seq.*, and Section 36–82–100, *et seq.* (Georgia's "Little Miller Act"). The district court granted summary judgment for United Pacific. Because we find that there exists a genuine issue of material fact, we reverse.

## I. *Facts*

Cobb County, Georgia engaged Noonan Kellos, Inc. (now known as Noonan–South, Inc.) as prime contractor to build a jail for the county. Noonan–South, as required by law, executed payment and performance bonds as principal, with United Pacific as surety. Noonan–South hired Roanoke Iron and Bridge Works, Inc. as a subcontractor to supply and install the detention equipment in the jail. Roanoke arranged to purchase various locking devices and other hardware from Southern Steel. From 1983 to 1986, Roanoke issued to Southern Steel a series of purchase orders for items used in locking systems. The parties have stipulated that Southern Steel shipped the last of the materials provided under these purchase orders no later than July 15, 1986.

In September 1986 Roanoke instituted bankruptcy proceedings. Shortly thereafter, Southern Steel notified Noonan–South that because of the substantial amount of money Roanoke owed Southern Steel for materials already delivered to the jail, Southern Steel would provide no additional materials to the project unless they were paid for in advance or at delivery. On November 17, 1986, Southern Steel wrote to Noonan–South to inform it that Southern Steel had a number of items that Roanoke had ordered for the Cobb County jail but for which it had not yet paid. Southern Steel wrote that the materials would be returned to inventory unless Noonan–South requested and paid for them. Noonan–South did so, and Southern Steel shipped the materials to the jail site around December 15, 1986. After August 1986 Noonan–South also ordered and paid for, and Southern Steel delivered, other materials for the jail.

In addition to the materials that Noonan–South ordered and paid for, Southern Steel

shipped to the jail a number of other items for which it did not charge. The items provided on a "no charge" basis included screws, keys, an allen wrench, a strike plate, and at least ten reworked electric locks. The locks had to be repaired because they had burned out at the job site. These materials were shipped to the jail in late November and mid-December 1986.

On February 6, 1987, Southern Steel sent to United Pacific by Federal Express written notice of its claim against the payment bond for the unpaid balance of all its invoices to Roanoke.[1] Southern Steel later filed suit against United Pacific, claiming United Pacific was liable to Southern Steel for the money owed to Southern Steel by Roanoke under the payment bond United Pacific provided for Noonan–South. United Pacific eventually filed a motion for summary judgment, asserting that Southern Steel was barred from recovering on the bond because it had failed to provide timely notice as required by Georgia's Little Miller Act, O.C.G.A. Section 36–82–104(b). The notice provision of the statute reads as follows:

> Every person entitled to the protection of the payment bond ... who has not been paid in full for labor or material furnished in the prosecution of the work ... shall have the right to bring an action on such payment bond ... for the amount, or the balance thereof, unpaid at the time of the commencement of such action and to prosecute such action to final execution and judgment for the sum or sums due him; provided, however, that any person having direct contractual relationship with a subcontractor, but no contractual relationship express or implied with the contractor furnishing such payment bond or security deposit, shall have the right of action upon the payment bond or security deposit upon giving

written notice to the contractor within 90 days from the day on which such person did or performed the last of the material or machinery or equipment for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied.[2]

United Pacific argued that Southern Steel had given notice of its claim against the payment bond more than ninety days after providing the last of the materials for which it made claim, and was therefore barred from recovery. Southern Steel filed a motion for partial summary judgment, seeking a determination that its notice had been timely given.

The district court granted summary judgment for United Pacific. In the district court's opinion, the case turns on whether notice can be measured from any of the items provided by Southern Steel to Noonan–South at no charge in November and December 1986. The judge noted that notice must be measured from the last date of original contract performance, rather than the date of any corrective performance. *See Ranger Constr. Co. v. Robertshaw Controls Co.*, 166 Ga.App. 679, 680, 305 S.E.2d 361, 362 (1983). In finding for United Pacific, the court reasoned as follows:

> it appears that "no charge" items shipped within 90 days of the February 6 letter to United Pacific constituted corrective work in the nature of "reworked" lock assemblies or, in the case of the screws, keys, allen wrench, and strike plate, were of minimal value. This court holds that Southern Steel has not come forward with sufficient facts to show that the "no charge" items shipped within 90 days of the February 6 letter were original contract items, as opposed to corrective items. *See Celotex Corp. v.*

---

**1.** Although the notice was sent by Federal Express, rather than by registered or certified mail as the statute requires, the only consequence of the substitution under Georgia law seems to be that the notice is *deemed given* when received by the surety or prime contractor, rather than when mailed by the supplier. *See F.L. Saino Mfg. Co. v. Fireman's Fund Ins. Co.*, 173 Ga.App. 753, 753–54, 328 S.E.2d 387, 388 (1985). United

Pacific does not dispute that it received the notice on February 7, 1987.

**2.** For the purpose of this motion, Southern Steel concedes it has no contractual relationship with Noonan–South that would eliminate the need for notice. *See* Appellant's Brief at 14.

**1204**

*Catrett,* 477 U.S. 317, 106 S.Ct. 2548 [91 L.Ed.2d 265] (1986).

## II. *Discussion*

As a preliminary matter, we note that because Georgia's Little Miller Act is, as its nickname suggests, substantially similar to the federal Miller Act, Georgia courts look to federal law interpreting the Miller Act to guide their interpretation of the Little Miller Act. *See Amcon, Inc. v. Southern Pipe & Supply Co.,* 134 Ga.App. 655, 656, 215 S.E.2d 712, 713 (1975); *Porter–Lite Corp. v. Warren Scott Contracting Co.,* 126 Ga.App. 436, 438–39, 191 S.E.2d 95, 97 (1972).

On appeal, Southern Steel makes two arguments to explain why it believes the district court erred in granting summary judgment for United Pacific: First, it contends that the keys and most of the other material provided at no charge "relate back" to and complete earlier shipments of material supplied pursuant to purchase orders from Roanoke for which Roanoke never paid Southern Steel. Because the keys, for example, were necessary both to complete the earlier shipments and to operate the locking systems that Southern Steel was responsible for providing, they are the last "material for which ... claim is made" and thus set the date from which notice should be measured. Second, the reworked locks are corrective work, but that fact alone does not prevent them from setting the date from which notice is measured. To determine whether corrective work can extend the period within which notice is proper the court must consider a number of factors, most notably the reason why repairs were necessary. If repairs were necessary through no fault of the supplier, and required in order to fulfill responsibilities under the original contract, then those repairs extend the time within which notice is timely.

Southern Steel's first argument is foreclosed by a stipulation between the parties. Stipulation 87 reads as follows:

Southern Steel's records indicate that the materials subject to the following invoices were supplied to the project on the following dates:

| Invoice No. | Date Supplied |
| --- | --- |
| 2187 | March 1, 1985 |
| 2345 | March 19, 1985 |
| 9450 | March 20, 1985 |
| 9458 | March 25, 1985 |
| 2483 | March 30, 1985 |
| 2608 | April 17, 1985 |
| 2672 | April 24, 1985 |
| 9492 | April 24, 1985 |
| 001899 | February 14, 1986 |
| 002806 | July 15, 1986 |

R.2–42–13. The list of invoices in Stipulation 87 is identical to the list of invoices in the letter making notice of claim against the payment bond. R.2–42–exhibit 96.

The language of the stipulation is not broad enough to accommodate Southern Steel's argument that some of the no charge materials provided in November and December 1986 served to complete earlier shipments for which Roanoke had not paid and for which Southern Steel now makes claim. The stipulation does not say that *"some of* the materials subject to the following invoices were supplied to the project ..."* or that *"most of* the materials subject to the following invoices were supplied to the project...."* The stipulation simply provides, without qualification or exception, that the materials subject to the listed invoices were provided to the project by July 15, 1986. Since the listed invoices are the only invoices "for which ... claim is made" by Southern Steel, Stipulation 87 admits that Southern Steel provided the last of the "materials for which ... claim is made" on July 15, 1986. Southern Steel therefore cannot claim that the no charge items provided in November and December 1986 are "materials for which ... claim is made."

■ Southern Steel's second argument, however, cannot be so easily dismissed. Southern Steel recognizes that, as a general rule, repairs do not toll the notice period in Miller Act cases. *Johnson Serv. Co. v. Transamerica Ins. Co.,* 485 F.2d 164, 173 (5th Cir.1973). However, "each case must be judged on its own facts, and ... sweeping rules about 'repairs' offer little help in the necessary analysis." *Id.* Factors in

that necessary analysis "include the value of the materials, the original contract specifications, the unexpected nature of the work, and the importance of the materials to the operation of the system in which they are used." *United States ex rel. Georgia Elec. Supply Co. v. United States Fidelity & Guar. Co.*, 656 F.2d 993, 996 (5th Cir. Unit B Sept. 1981) [hereafter *Georgia Electric*].[3]

In *Johnson Service Company*, the supplier "learned in late January 1970 of the crucial defects in the operation of its equipment caused by the incorrect plans and specifications of other subcontractors. Without the alteration of these mistakes, the central control panel, which regulated the air conditioning equipment, would not have been a workable installation." *Johnson Serv. Co.*, 485 F.2d at 173–174. The court held:

> In light of the unexpected nature of the work, the fact that it arose from faulty plans furnished by others, and the importance of the changes for the entire system, the labor performed by plaintiff after January 26, 1970, falls well within the range of conduct that has been recognized in Miller Act decisions as extending the notice period.

*Id. Cf. Trinity Universal Ins. Co. v. Girdner*, 379 F.2d 317, 318 (5th Cir.1967) ("work performed upon demand of the government to correct defects in the work as originally performed" sufficient to toll statute of limitations).

█ The situation here is very similar to the situation in *Johnson Service Company*. Southern Steel contends that the reworked locks needed to be repaired not through any fault of Southern Steel, but because of the faulty design or installation work done by other subcontractors. Appellant's Brief at 27–28. If that is true, then Southern Steel may be able to show that the reworked locks, under the analysis outlined in *Georgia Electric*, were furnished as part of the original contract rather than

merely for repairs. Under that analysis, we consider "the value of the materials, the original contract specifications, the unexpected nature of the work, and the importance of the materials to the operation of the system in which they are used." *Georgia Electric*, 656 F.2d at 996.

Georgia law notes the requirement that notice be measured from the last original contract performance and not from repairs, *see Porter–Lite Corp. v. Warren Scott Contracting Co.*, 126 Ga.App. 436, 440 n. 1, 191 S.E.2d 95, 98 n. 1 (1972); *Ranger Constr. Co. v. Robertshaw Controls Co.*, 166 Ga.App. 679, 680, 305 S.E.2d 361, 362 (1983), but provides little guidance on how the distinction is defined. We find the analysis in *Johnson Service Company* and *Georgia Electric* persuasive on this point and will apply it to this case. Doing so, we note first that the record does not reveal the value of the work necessary to repair the locks. However, it is clear that the locks that needed to be reworked were required under the original contract specifications. Southern Steel argues that the reworking was necessary through the fault of others—that would necessarily make the rework unexpected, since Southern Steel could not have known that other subcontractors would err. Finally, working locks are quite important to the operation of a jail. In light of *Johnson Service Company* and *Georgia Electric*, therefore, it appears that if Southern Steel can prove that it was not responsible for the locks' failure, the reworked locks may qualify as original contract performance and render Southern Steel's notice timely.

Our decision is made easier by the fact that the party seeking summary judgment, United Pacific, conceded in the district court the existence of a genuine issue of material fact on this question. In its reply brief to the district court, apparently in an attempt to defeat Southern Steel's motion

---

**3.** Where Georgia Little Miller Act law does not provide a clear answer, we will look first to the body of law with which we are most familiar, Eleventh Circuit precedent, for cases construing the federal Miller Act to guide our interpretation of Georgia law. Because *Johnson Service Company* and *Georgia Electric* do not interpret Georgia's Little Miller Act, they instruct but do not control our interpretation of that statute.

for partial summary judgment, United Pacific argued as follows:

> Southern Steel contends that it is entitled to rely on reworked items (such as malfunctioning locks) to extend the date by which the ninety day notice period commenced. However, as Southern Steel recognizes, the deadline will not be extended if the rework was necessary as a result of deficiencies in Southern Steel's performance. *There is at least a question of material fact as to whether United Pacific was responsible for deficiencies in the locks which had to be reworked....* Southern Steel was *arguably* responsible for the defective design in that Southern Steel did not remedy that design when it had the opportunity to do so which may have prevented the locks from being burned out and having to be reworked.

R.3–50–18 n. 3 (emphasis added).

Our review of the record convinces us that United Pacific is correct that there is at least a genuine issue of material fact about whether Southern Steel or United Pacific was responsible for the necessity of repairing the locks. United Pacific does argue that the locks needed to be repaired because of a faulty module that had given Southern Steel problems on an earlier job, and that Southern Steel knew that the locks were faulty when they supplied them to the project, *see* Appellee's Brief at 23–24. However, we have read the portions of the record that appellee cites to support this argument, and they do not support the claim that Southern Steel knowingly supplied locks likely to be faulty. In fact, the person upon whose deposition United Pacific relies to show such knowledge by Southern Steel not only disavowed sufficient expertise to be able to offer an opinion about whose fault it was that the locks had burned out, Deposition of Robert James Caudill at 49, he also said when pressed that he "assumed it was the—the customer, since he had too high a voltage on it." *Id.* at 50. When read in the light most favorable to Southern Steel, the nonmoving party, *Sweat v. Miller Brewing Co.,* 708 F.2d 655, 656 (11th Cir.1983), this testimony does not establish that Southern Steel

knew that it was supplying faulty locks to Noonan–South, the prime contractor.

Furthermore, even if it did show such knowledge, Southern Steel's electrical engineer, who presumably does have the necessary expertise to offer a useful opinion about why the locks burned out, unequivocally testified that after a personal inspection of the jail project site, he concluded that none of the problems with the locks were the fault of Southern Steel. Deposition of Leslek Bublewicz at 23. Even if Robert Caudill's deposition testimony did tend to show that the locks burned out because of the fault of Southern Steel, the deposition of Leslek Bublewicz tends to show exactly the opposite. United Pacific therefore has not met its burden of showing that there exists no remaining genuine issue of material fact. The district court therefore erred in granting summary judgment for United Pacific.

### III. *Conclusion*

We reverse the grant of summary judgment and remand the case to the district court for further proceedings.

REVERSED and REMANDED.