656 A.2d 1232

## INSURANCE COMPANY OF NORTH AMERICA

v.

## GENSTAR STONE PRODUCTS COMPANY.

No. 99, Sept. Term, 1994.

Court of Appeals of Maryland.

April 14, 1995.

162

Douglas G. Worrall (Roderick R. Barnes, Smith, Somerville & Case, on brief) Baltimore, for appellant.

Edward J. Gilliss (Royston, Mueller, McClean & Reid, on brief) Towson, amicus curiae.

Thomas F. McDonough (Royston, Mueller, McClean & Reid, on brief) Towson, for appellee.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (Retired, Specially Assigned).

RODOWSKY, Judge.

Here, a materials supplier to a subcontractor on a public school construction project sues on the prime contractor's payment bond required under the Maryland Little Miller Act (the Act), Maryland Code (1985, 1995 Repl.Vol.), §§ 17–101 through 17–110 of the State Finance and Procurement Article. The surety contends that the supplier's notice to the prime contractor, required by § 17–108(b)(1) of the Act, was untimely. Under the surety's submission, sales and deliveries to the subcontractor of materials that the subcontractor then used in making repairs to the work must be disregarded in computing

the timeliness of the notice. The surety's second defense invokes the statute governing trust relationships in the construction industry, Md.Code (1974, 1988 Repl.Vol., 1994 Cum. Supp.), §§ 9–201 through 9–204 of the Real Property Article. The contention is that duties imposed by that statute were violated by the manner in which the supplier applied payments from the subcontractor on the latter's running account. For the reasons explained below we shall affirm the circuit court's rejection of both of these defenses.

In November 1989 Charles J. Frank, Inc. (Frank), as prime contractor, and the Baltimore County Board of Education, as owner, entered into a contract for the design, construction and financing of Hines Elementary School. The appellant, Insurance Company of North America (INA), furnished the payment and performance bonds that are required by § 17–103(a) of the Act. Frank subcontracted the concrete work to Beck Enterprises, Inc. (Beck). Beck, in turn, purchased materials, principally concrete and stone, from the appellee, Genstar Stone Products Company (Genstar). These purchases were made on an open account. Deliveries by Genstar to Beck at the school site commenced in April 1991. The last four invoices from Genstar to Beck were for the delivery of thirty-two cubic yards of concrete and one cubic yard of grout on September 27, for three cubic yards of concrete on October 4, and for one cubic yard of concrete on November 8, 1991. Beck did not pay Genstar in full, and, on January 23, 1992, Genstar gave Frank written notice of Beck's non-payment. In December 1992 Genstar instituted the instant complaint, naming Beck and INA as defendants.

Beck's president filed an answer for it advising that Beck's assets had been claimed under a lien by the Internal Revenue Service. Beck did not participate further in the proceedings. Frank, appearing by the same counsel who appeared for INA, petitioned the court to intervene. That petition was granted, and the court ordered that Frank be designated a defendant in the action and that it file an answer. Frank never filed an answer. Thereafter, INA's counsel, acting solely in INA's name, conducted the defense.

Genstar filed with its complaint a motion for summary judgment, supported, *inter alia*, by eighty-nine invoices, the affidavit of Genstar's bookkeeper, and Genstar's notice of January 23, 1992 to Frank. The eighty-nine invoices reflect that between April 5 and November 8, Genstar made thirty-eight deliveries of stone, one of grout, and fifty of concrete.

In opposition to summary judgment INA filed an affidavit of Frank's project manager on the Hines school project. This affidavit is the factual basis for INA's two legal defenses. The notice defense relies on § 17-108(b)(1) of the Act, which reads:

"A supplier who has a direct contractual relationship with a subcontractor . . . of a contractor who has provided payment security but no contractual relationship with the contractor may sue on the security if the supplier gives written notice to the contractor within 90 days after the labor or materials for which the claim is made were last supplied in prosecution of work covered by the security."

In his affidavit, Frank's project manager in part states:

"The last date upon which ready-mix concrete and/or aggregate was supplied, necessary to complete the work on the contract, was September 27, 1991. However, on October 4, 1991 Beck was required to jack out and repair a doorway that had previously been constructed. In addition, on November 8, 1991 Beck returned to repair certain sills that had previously been constructed but were beginning to crack. In order to complete these repairs, on October 4, 1991 Beck supplied three cubic yards of its materials and on November 8, 1991 Beck supplied an additional one cubic yard of materials."

Genstar's November 8, 1991 delivery to Beck is critical to the timeliness of its January 23, 1992 notice to Frank. If INA is correct that the deliveries of October 4 and November 8 cannot be considered because the subcontractor used the materials in making repairs, then Genstar's claim fails.

The project manager further affirmed that he had "conducted an investigation into the payment history" between Frank and Beck and between Beck and Genstar pertaining to the

Hines school project. He said that "[i]t appears that shortly after we [*i.e.*, Frank] would pay Beck for its concrete services, Beck would pay Genstar but allocate the money to cover unsecured jobs." If INA is correct that Genstar had a statutory duty to apply to invoices for Hines school materials payments by Beck utilizing funds paid by Frank, then a remand would be required to recompute the account.

The circuit court concluded that there was no genuine issue of material fact, and, by docket entry of May 24, 1993, summary judgment was entered in favor of Genstar against Beck and INA for $100,164.69. Within ten days thereafter, INA moved to alter the judgment on the grounds that the court had erred in rejecting the untimely notice defense and that the court had not ruled on the misapplication of payments defense. By an undocketed letter of May 25 to the court, counsel for Genstar requested amendment of the judgment to add $18,969.50 in finance charges.

In a memorandum opinion dated June 23, 1993 and docketed June 25, 1993, the court explained its reasons for rejecting the notice defense, and the court amended the judgment against Beck and INA to $119,134.19.[1]

INA moved to revise the amended judgment. This second post-judgment motion was filed on the eleventh day after entry on the docket of the amended judgment. By a "MEMO-RANDUM TO THE FILE" dated July 30, signed by the court and with copies to counsel, the court ruled that the INA motion to alter the original judgment of May 24, 1993 was denied, that the motion to revise the amended judgment was denied with respect to the notice defense, but that, "[t]o the extent that the court will consider further doctrine of the misapplication of funds, the judgment is opened for further consideration." These rulings of July 30, 1993 do not appear on the docket. This memorandum, although included in the

---

1. Entry of the amended judgment would seem to have mooted INA's motion to alter judgment. *See Popham v. State Farm Mut. Ins. Co.,* 333 Md. 136, 144, 634 A.2d 28, 32 (1993).

original record transmitted by the clerk, contains no date stamp by the clerk.

By a written "POST JUDGMENT RULING" dated November 16 and docketed November 22, 1993, the court explained its reasons for rejecting INA's misapplication of funds defense and denied INA's motion to revise the amended judgment. The court stated that denial of the INA motion made final the amended judgment of June 25, 1993.

INA appealed to the Court of Special Appeals. It also petitioned this Court to issue the writ of certiorari prior to consideration of the matter by the intermediate appellate court. We granted the writ.

## I

This Court will notice on its own motion problems relating to appealability. *Medical Mut. Liab. Ins. Soc'y v. B. Dixon Evander & Assocs.*, 331 Md. 301, 306 n. 6, 628 A.2d 170, 172 n. 6 (1993); *Albert W. Sisk & Son, Inc. v. Friendship Packers, Inc.*, 326 Md. 152, 158, 604 A.2d 69, 72 (1992). INA's motion to revise the amended judgment can only be treated as a motion under Rule 2–535, inasmuch as it was not filed within ten days of the amended judgment. *Alitalia Linee Aeree Italiane v. Tornillo*, 320 Md. 192, 200, 577 A.2d 34, 38 (1990). The motion to revise did not halt the running of the time for appeal. Md.Rule 8–202(c). If INA and Beck were the only defendants, the order for appeal would be too late to bring up for review the amended judgment of June 25. Frank, however, was made a party defendant upon its intervention. There is no judgment as to Frank, and there has been no certification pursuant to Rule 2–602(b). Accordingly, there is no final judgment in the action. Md.Rule 2–602(a). The appeal is premature.

We exercise our discretion, however, under Md.Rule 8–602(e)(1)(C) to enter as a final judgment the amended judgment in favor of Genstar against INA and Beck. *See Adams v. Manown*, 328 Md. 463, 469 n. 1, 615 A.2d 611, 613–14 n. 1 (1992); *Shofer v. Stuart Hack Co.*, 324 Md. 92, 98, 595 A.2d

1078, 1080–81 (1991), *cert. denied,* 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992).

## II

### A

The rule for which INA contends, which we shall call the "repair rule," is based on federal case law interpreting the notice provisions of the Miller Act, 40 U.S.C. § 270b(a). That section provides in relevant part:

> **"§ 270b. Rights of persons furnishing labor or material**
>
> "(a) Every person who has *furnished labor or material in the prosecution of the work provided for in such contract,* in respect of which a payment bond is furnished under section[ ] 270a ... shall have the right to sue on such payment bond for the amount ... unpaid.... *Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon said payment bond upon giving written notice to said contractor *within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made...."*

(First and third emphasis added).

The repair rule is stated in its most basic form in 8 J.C. McBride, *Government Contracts* § 49A.100[15], at 49A–183 (1994), as follows:

> "Correction by the subcontractor of defects in its work does not operate to extend the notice period; otherwise, the time could be prolonged indefinitely after completion of the work, *United States ex rel. McGregor Architectural Iron Co., Inc. v. Merritt–Chapman & Scott Corp.,* 185 F.Supp. 381 (M.D.Pa.1960)."

Some federal courts, however, have applied the repair rule to suppliers as well, as discussed, *infra.*

Where the claimant against the bond is simply a supplier, it is not at all uncommon for an issue of timeliness of notice to the prime contractor to be an issue under facts similar to those presented here. Typically, there is no express contract by which the subcontractor agrees to purchase, and the supplier agrees to provide, all of the movables required by the subcontractor to perform the subcontract on the bonded job. Typically, there is simply a course of dealing under which the subcontractor places a series of orders with the supplier. Each order generates a separate invoice by the supplier, and the supplier might even have a record of delivery to the site of the bonded job. Under those facts, when the supplier-claimant gives notice within the statutorily required period after the last sale in the series, sureties have contended that the notice is effective only as to sales made within the required notice period. For example, if the supplier sold and delivered over a period from day one to day 180, and gave notice on day 200 under a statute requiring notice within ninety days from the last delivery, sureties have contended that the notice is effective only for sales and deliveries made from and on day 111 through day 200.

In cases arising under the Miller Act, this argument generally has been rejected by unifying the series of deliveries into one contract. For example, Judge Soper, writing in 1959 for a panel of the United States Court of Appeals for the Fourth Circuit that also included Chief Judge Sobeloff and Judge Haynsworth, said:

> "The notice provision as to the subcontractor in the Miller Act ... speaks of a *contractual relationship* between the contractor and the subcontractor, which is broad enough to cover a series of separate contracts or orders relating to the same project.
>
> . . . .
>
> "... Moreover, the Miller Act lends itself to the alternate construction that if all the goods in a series of deliveries by the materialman to a subcontractor are used on the same government project, the notice is in time as to all of the

deliveries if it is given within ninety days from the last delivery."

*Noland Co. v. Allied Contractors, Inc.*, 273 F.2d 917, 920 (4th Cir.1959); *see also Apache Powder Co. v. Ashton Co.*, 264 F.2d 417, 423–24 (9th Cir.1959); *Fourt v. United States ex rel. Westinghouse Elec. Supply Co.*, 235 F.2d 433, 434 (10th Cir. 1956); *United States ex rel. Chemetron Corp. v. George A. Fuller Co.*, 250 F.Supp. 649, 658–59 (D.Mont.1966); *United States ex rel. J.A. Edwards & Co. v. Bregman Constr. Corp.*, 172 F.Supp. 517, 522 (E.D.N.Y.1959). But see Judge Friendly's opinion for a panel of the Second Circuit that also included Judges Medina and Moore in *United States ex rel. J.A. Edwards & Co. v. Peter Reiss Constr. Co.*, 273 F.2d 880 (2d Cir.1959) (a notice within ninety days of the last delivery does not relate back across a hiatus that is greater than ninety days between deliveries so that it is not effective as to deliveries prior to the hiatus), *cert. denied*, 362 U.S. 951, 80 S.Ct. 864, 4 L.Ed.2d 869 (1960).

One theoretical justification for the repair rule is that it is a corollary to the unitary contract concept applied to a series of supplier's deliveries for purposes of the supplier's satisfying the notice condition in the Miller Act. Movables furnished by the supplier that are used by the subcontractor in a performance that conforms to the prime contractor-subcontractor contract are considered to be furnished under the theoretically unitary contract between supplier and subcontractor. These sales enjoy relation back. On the other hand, some courts consider movables furnished to repair, replace, or correct work to be furnished by the supplier under a different or separate contract with the subcontractor. These sales do not enjoy relation back.

In the case before us the circuit court did not rely on Miller Act precedents. It decided the repair rule issue primarily by applying Maryland precedents under the mechanics' lien statute. Early on in this State the question arose under Md.Code (1860), Art. 81, "Mechanics' Lien," § 11 of how to treat for notice purposes a series of deliveries by a supplier. That statute provided in relevant part:

"If the contract for furnishing such work or materials ... shall have been made with any ... person except the owner ..., the person ... doing work or furnishing materials ... shall not be entitled to a lien unless, within sixty days after furnishing the same, [the person] shall give notice in writing...."

In *Trustees of the German Lutheran Evangelical St. Matthew's Congregation v. Heise*, 44 Md. 453 (1876), Judge Alvey, writing for the Court, rejected the argument that a notice was effective only for materials delivered within the preceding sixty days. The claimant need not establish an *"express antecedent contract." Id.* at 469. Rather,

"the character of the account, the time within which the work was done or the materials were furnished, and the object of the work or materials, may afford proper grounds for the presumption that the work was done or the materials were furnished with reference to an understanding from the commencement that such work or materials should be done or furnished, if required by the builder."

*Id.* Under those circumstances the notice is effective if given within sixty days from the last item in the account. *Id.* Otherwise, the Court reasoned, every supplier or subcontractor would be required to notice several liens during the progress of a single building. *Id.* at 469–70. But, the rule is subject to the following limitation:

"[W]here the materials are furnished for separate and distinct purposes, or at different times, and at considerable intervals, or under distinct contracts or orders, though to be used by the contractor or builder in executing one and the same contract with the owner, no such presumption will arise, and the right to take the lien must date from the time of furnishing the different parcels of material, and not from the last item in the account."

*Id.* at 470.

The rule of the German Lutheran Church case is now well established in Maryland mechanics' lien law. For example, in *Mt. Airy Plumbing & Heating, Inc. v. Grey Dawn Dev. Co.*,

237 Md. 38, 205 A.2d 299 (1964), subcontractors stopped work on a house in November and December of 1961, because they had not been paid, and did not resume work until September 1962. Their notice, given within ninety days of completion in October 1962, was effective to cover the work done in 1961. The work in the fall of 1962 was "necessary for the proper performance of their [respective] contracts." *Id.* at 43, 205 A.2d at 302.

The general rule of the German Lutheran Church case has also been applied in *Clark Certified Concrete Co. v. Lindberg,* 216 Md. 576, 141 A.2d 685 (1958); *T. Dan Kolker, Inc. v. Shure,* 209 Md. 290, 121 A.2d 223 (1956); *District Heights Apartments, Section D–E, Inc. v. Noland Co.,* 202 Md. 43, 95 A.2d 90 (1953); *Harrison v. Stouffer,* 193 Md. 46, 65 A.2d 895 (1949); and in *Back v. Reisterstown Lumber Co.,* 24 Md.App. 415, 332 A.2d 30, *cert. denied,* 275 Md. 745 (1975).

More significant from the standpoint of INA's argument in the present case is *Reisterstown Lumber Co. v. Reeder,* 224 Md. 499, 168 A.2d 385 (1961). In that case the timeliness of a lumber supplier's notice of mechanics' lien depended on measuring the beginning of the notice period by the date of delivery of at least one of three items delivered. The items were a $58.60 door, a $4.20 screen, and an $11.00 roto-lock operator. "All three of these items were replacements of material previously delivered and which the owners or builder desired to be substituted for defective items." *Id.* at 506, 168 A.2d at 388. This Court, although approving the imposition of a lien, required that the charges for the three replacement items be eliminated from the unpaid balance secured by the lien. *Id.* at 508, 168 A.2d at 389–90. Despite the fact that the critical deliveries were for "repair" of defects chargeable to the supplier, this Court observed that the mechanics' lien statute "makes no exception with respect to items delivered for 'replacement' or substitution for previously delivered, but defective items." *Id.* at 506, 168 A.2d at 388. The notice was effective because, *inter alia,* the lumber supplier was not attempting to do "a trifling amount of work as a mere subterfuge to extend the lien period." *Id.* at 507, 168 A.2d at 389.

We held that *"such replacement[s] made in good faith and at the insistence of the owner or his builder* are proper items to be considered for the purpose of ascertaining the last furnishing of materials...."* *Id.*

In drawing on the mechanics' lien precedents in the instant case, the circuit court concluded that there was no indication that the materials supplied by Genstar "would reasonably be interpreted as being part of more than one contract." Genstar clearly provided "all materials it was requested to provide." Genstar did not have "any control over or knowledge of whether the materials provided were used in 'repair work' or work under the original contract" between Beck and Frank. There was no indication that the critical delivery by Genstar was "solely to extend the date from which the ninety day period runs." Thus, the circuit court held that the January 23 notice was effective for all unpaid deliveries in the series.

### B

Against the foregoing background the issue on INA's notice defense would seem to be whether this Court should apply its mechanics' lien precedents for determining whether a supplier's notice relates back to be effective as to all sales in a series or whether this Court should apply federal precedents recognizing a repair rule. Preliminarily we note that the application of mechanics' lien precedents is not foreclosed by a contrary legislative intent in enacting the Maryland Act.

The Miller Act was enacted in 1935. Act of August 24, 1935, ch. 642, 49 Stat. 793. The Maryland Act was enacted by the Acts of 1959, ch. 10, effective June 1, 1959. 1959 Md.Laws at 15. It is clear that the federal cases up to that time had not applied a repair rule.

The seminal case applying a repair rule was decided July 27, 1960. In *United States ex rel. McGregor Architectural Iron Co. v. Merritt–Chapman & Scott Corp.,* 185 F.Supp. 381 (M.D.Pa.1960), the claimant was at the third tier of subcontractors. It had completed its work in early 1954, but returned to the job site in June 1955 on two occasions to do a

total of five hours work in furnishing missing bolts and closing some holes that had been burned into posts in order to erect them. The omissions had been overlooked when the work was inspected in 1955. The court held that the notice must be given within ninety days after the performance of work "called for by the terms of the prime contract." *Id.* at 383. The court then reasoned that unlimited extension of the notice period by correcting defects would produce chaos.[2]

A choice between federal Miller Act and Maryland mechanics' lien law precedent was confronted by this Court in *Atlantic Sea–Con, Ltd. v. Robert Dann Co.*, 321 Md. 275, 582 A.2d 981 (1990). The issue there was whether one who supplies labor or materials to a materialman could be a claimant on the bond under the Maryland Act. Such claimants are not recognized under the federal act. We recognized that "[h]istorically, when interpreting the Maryland Little Miller Act, we have analogized the Act with the Maryland mechanics' lien statute." *Id.* at 283–84, 582 A.2d at 985. We departed from that historic approach in *Atlantic Sea–Con* and found the federal authority persuasive because, in large measure, "[t]he class of persons protected by the federal Miller Act has been well settled since 1944, long before the Maryland Legislature modeled the Little Miller Act after it." *Id.* at 286, 582 A.2d at 986.

In the matter now before us the federal construction relied on by INA was definitely not well established when the

---

**2.** The court in *McGregor Architectural Iron Co.* cited as supporting authority *United States ex rel. J.A. Edwards & Co. v. Peter Reiss Constr. Co.*, 174 F.Supp. 264 (E.D.N.Y.1959), which was affirmed later that year, 273 F.2d 880 (2d Cir.). There the last undisputedly qualifying delivery by the supplier-claimant was made October 31, 1956. Materials totaling $10,766.27 had been delivered over the life of the job, there was an unpaid balance of $6,274.44 and the critical delivery was on March 5, 1957 involving a switch costing $15.90. The court said that the plaintiff's "proof is most unsatisfactory and unconvincing. It makes a desperate and futile effort to tie in this minor item with the prime contract." 174 F.Supp. at 266. We read *Peter Reiss Constr. Co.* to be based on a fact-finding that the critical delivery was in effect a sham. *Peter Reiss Constr. Co.* is completely consistent with the German Lutheran Church case and its progeny.

Maryland Act became effective. Thus, legislative intent does not direct our choice.

## C

Although we have used the term, "repair rule," as a shorthand description of INA's notice defense, decisions involving the claims of suppliers under the Miller Act reflect that there are widely divergent approaches as to the effect of defects in the public work on the running of the notice period. A condensed survey demonstrates the proposition.

At one end of the spectrum is *United States ex rel. General Elec. Co. v. Gunnar I. Johnson & Son, Inc.*, 310 F.2d 899 (8th Cir.1962). In December 1959 the supplier of electrical parts and equipment shipped two bus duct elbows to the job site, but they did not fit. At no additional charge the supplier altered the ducts, reshipped them, and they were delivered and installed in April 1960. The April date became the critical date for notice purposes. Looking to the literal language of the Miller Act, the court said that "[i]t is obvious that said bus duct elbows are a part of the material 'for which claim is made.'" *Id.* at 903. The court reasoned that "until such time as they were 'furnished' in such condition as to meet the engineering requirements and be ready and fit for installation as a part of the system, no enforceable claim did or could arise." *Id.* The Eighth Circuit declared that the case before it was "readily distinguishable from those cases involving the performance of labor and supplying of minor items of materials for the purpose of correcting defects, or making repairs following inspection of the project, and not performed or supplied as a part of the original contract." *Id.*

To us, the attempted distinction is elusive, if not illusory. The rationale seems to be a substitute analysis that eviscerates the repair rule. If a claim does not arise until work is performed in accordance with the portion of the prime contract embodied in the subcontractor-supplier contract, then all second effort or resupply, designed to achieve contract con-

formity, qualifies to trigger the running of the notice period for the entire series of deliveries.

Other cases, however, make a distinction between what may be called misfeasance and non-feasance. If the item supplied is defective and must be replaced, replacement is attributed to a new contract so that notice based on the delivery of the replacement relates back only ninety days. On the other hand, rectifying the total failure to deliver an item is considered part of the original contract and full relation back applies. For cases illustrating the latter, see *United States ex rel. Noland Co. v. Andrews*, 406 F.2d 790, 792 (4th Cir.1969) ("The fact that the valves were called for by both the primary contract and the subcontract and were not furnished till January 17, 1967, is dispositive of the issue, notwithstanding the Government's acceptance of the premises at an earlier date under the mistaken impression that the work had been completed."); *United States ex rel. Raymond A. Bergen, Inc. v. DeMatteo Constr. Co.*, 467 F.Supp. 22, 24–25 (D.Conn.1979); and *United States ex rel. Lank Woodwork Co. v. CSH Contractors, Inc.*, 452 F.Supp. 922, 925 (D.D.C.1978).

Another approach, bearing both similarities to, and differences from, the "non-feasance" cases is presented in *United States ex rel. Georgia Elec. Supply Co. v. United States Fidelity & Guar. Co.*, 656 F.2d 993 (5th Cir.1981). Ballasts had been mistakenly omitted from the fluorescent lighting fixtures that had been installed in the project. Subsequently, the electrical subcontractor's supplier furnished the ballasts, and that date of delivery became the critical date for notice purposes. In the trial court a jury found for the supplier-claimant, and the Fifth Circuit affirmed on that aspect of the case, after calling the issue "a close question." *Id.* at 996. The court advanced the following rationale:

"The line drawn by this Court and in other jurisdictions, whether the materials were furnished for repairs or as part of the original contract, is admittedly hazy. As we noted in an earlier decision: '[E]ach case must be judged on its own facts and ... sweeping rules about "repairs" offer little help in the necessary analysis.' The factors to consider include

the value of the materials, the original contract specifications, the unexpected nature of the work, and the importance of the materials to the operation of the system in which they are used."

*Id.* (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 173 (5th Cir.1973)).

The only appellate decision in this State to have decided a repair rule argument applied the multiple factors test of *Georgia Elec. Supply Co.* In *Viscount Constr. Co. v. Dorman Elec. Supply Co.*, 68 Md.App. 362, 511 A.2d 1102 (1986), the electrical subcontractor's supplier had furnished an inverter (a device for transforming direct current into alternating current), but the inverter did not bear the contractually required Underwriter's Laboratory label of approval. Thereafter, the supplier furnished a satisfactory certificate, and the date of its delivery became the critical date. The surety contended that the "certification was furnished merely to correct an 'oversight ...,' and that delivery of the certification did not change the last delivery...." *Id.* at 365, 511 A.2d at 1103–04. The supplier argued "that the delivery of the 'last of the materials' under the original contract" was made when it furnished the certificate. *Id.* at 365–66, 511 A.2d at 1104.

The Court of Special Appeals viewed "the certification [as] an absolutely essential part of the inverter," without which "the inverter [was] no more than a pile of useless matter...." *Id.* at 367, 511 A.2d at 1104. The circuit court's fact-finding, made after trial, that the certificate was " 'material supplied under the original contract' " was affirmed. *Id.*

The factors listed in *Georgia Elec. Supply Co.* were applied in *Southern Steel Co. v. United Pacific Ins. Co.*, 935 F.2d 1201 (11th Cir.1991), a case arising under Georgia's Little Miller Act. The critical date for notice from a supplier for the construction of a jail was when at least ten reworked electric locks were delivered to the jail at no additional charge. The trial court had granted summary judgment for the surety, but the Eleventh Circuit reversed. The supplier contended that the reworked locks needed to be repaired because of faulty

design or installation by others. The court held that "[i]f that is true, then [the supplier] may be able to show that the reworked locks, under the analysis outlined in *Georgia Electric*, were furnished as part of the original contract rather than merely for repairs." *Id.* at 1205.

This analysis suggests that there is an element of sanction in the repair rule. The supplier who renders a defective performance does not benefit from full relation back, but the supplier whose product is damaged by the fault of others does benefit from full relation back. While this may be good policy, it is difficult to reconcile with the "original contract"/"subsequent contract" dichotomy. One who has defectively performed and is attempting to cure the deficiency would seem to be continuing to perform the original contract, while one who has fully performed and who is supplying a substitute product for that damaged by others would seem to have a new contract, or at least an addendum to the original contract.

The strict enforcement end of the repair rule spectrum is illustrated by *United States ex rel. Light & Power Utils. Corp. v. Liles Constr. Co.*, 440 F.2d 474 (5th Cir.1971), and *United States ex rel. Billows Elec. Supply Co. v. E.J.T. Constr. Co.*, 517 F.Supp. 1178 (E.D.Pa.1981), *aff'd*, 688 F.2d 827 (2d Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982). In the former case the supplier's critical date was evidenced by an invoice which bore no charge for the items delivered. From that the court inferred that the shipment contained replacement parts and that the "[r]eplacement of parts would be the correction of a shipping error." 440 F.2d at 477. The court held that the correction of errors does not extend the time for notice. *Id.* In *Billows Elec. Supply Co.* the court held that "[t]he burden is on the Materialman to prove that the material delivered to the job site on [the critical date] was included in the construction contract and/or a change order," and that the supplier had failed to meet that burden. 517 F.Supp. at 1181.

If *Billows Elec. Supply Co.* is representative of repair rule cases, it would seem to encourage suppliers to maintain repre-

sentatives at job sites in order to trace how and why their materials are incorporated into the work. On the other hand, a rule that encouraged prime contractors to select responsible subcontractors would seem to be more efficient.

## D

In sum, there is no intent on the part of the General Assembly that federal precedent dealing with a repair rule determine the construction of the notice provisions of the Maryland Act. Our editorial comments on repair rule cases in Part II.C, *supra,* have indicated the conceptual and practical difficulties that would flow from adopting the body of federal precedent as determining the construction of the Maryland Act. We have seen that under existing Maryland law, as developed under the mechanics' lien statute, there is no *per se* rule that separates a relatively continuous course of dealing between a supplier and a subcontractor into an original contract and a subsequent contract based solely on having furnished materials to correct a defect either in the work performed by the subcontractor or in the product as furnished by the supplier.

Further, from a business standpoint there is an advantage to persons supplying subcontractors who work on State, local and private construction projects in this State if the same rules apply to the commencement of the notice period under the Little Miller Act and the mechanics' lien statute. There is also an advantage to sureties and prime contractors, as well as to suppliers, involved in notice disputes under the Act, if they do not have to pay counsel to research and attempt to reconcile a national body of relatively conflicting decisions. If the highly relevant precedent lies in decisions under the Maryland mechanics' lien statute, the reconciliation task may not be eliminated, but at least the volume of material to be reviewed will not be as great as it would be if we held that Miller Act precedent was persuasive on the issue.

Finally, the decision by the Court of Special Appeals in *Viscount Constr. Co.* did not adopt a strict repair rule ap-

proach. In the absence of any decision by this Court, persons in the construction industry in this State presumably have been guided in their business decisions to date by *Viscount Constr. Co. Viscount Constr. Co.*'s multi-factor approach does not differ substantially from the test announced by this Court in the German Lutheran Church case.

■ For all of the foregoing reasons we hold that the delivery by a supplier to a subcontractor of materials that are used to correct work defectively done, or to replace a defective product, or to cure an omitted performance on a public work bonded under the Maryland Little Miller Act is not *per se* disqualified from constituting the event triggering the running of the time limit for notice from the supplier to the prime contractor. We further hold that decisions of this Court under the mechanics' lien statute, determining whether the course of dealing between a supplier and a subcontractor constitutes a single contract so that a notice will relate back to all prior sales and deliveries in the series, are highly relevant precedent under the Maryland Little Miller Act on that same issue.

■ Under the principles set forth above, the Circuit Court for Baltimore County correctly rejected INA's repair rule defense to Genstar's motion for summary judgment. Under the undisputed material facts evidenced by Genstar's invoices, the course of dealing between Genstar and Beck is to be viewed as a single contract so that a timely notice measured by the last delivery relates back over the entire contract. INA's defense rests on a *per se* application of a repair rule, an application which we reject.

### III

■ INA's second contention is that "[a] material supplier is obligated to apply funds received from a subcontractor to a particular project where the source of those funds was paid to the subcontractor by the contractor for the project." Brief of Appellant at 10. From the agreed statement of facts between

the parties, we draw the following principal facts relevant to this contention:

- Beck purchased materials from Genstar on open account for several projects including Frank's project.

- Where a payment to Beck was made by a joint check payable both to Beck and to Genstar, the payment by Beck to Genstar was specifically allocated to the project for which the payment to Beck was made.

- During the course of the Hines school project Frank made periodic payments by check payable to Beck alone. These payments were deposited into Beck's checking account from which Beck wrote checks to Genstar over the same period.

- In most instances of payment by Beck to Genstar, the allocation of the payment was noted on Beck's own check or on a supporting remittance advice.[3]

- In the absence of an express direction by Beck as to how Genstar was to apply a payment, Genstar allocated the payment against the oldest outstanding invoices to Beck.[4]

- This allocation method left unpaid the most recent invoices for materials supplied for Frank's project as well as balances on other projects.

INA contends that Genstar should be required to reapply among its accounts the funds received from Beck so that all funds originating from Frank for the Hines school project are applied to Beck's purchases for that project.

The legal basis relied upon by INA for its reallocation argument is the construction trust statute, the relevant part of

---

**3.** There is no contention that Genstar failed to apply any payment from Beck in the manner expressly directed by Beck in those instances where Beck expressly allocated the payment.

**4.** Genstar thereby applied the payments in accordance with Maryland and general law. *See, e.g., Clark–King Constr. Co. v. Salter,* 269 Md. 494, 500, 307 A.2d 485, 488–89 (1973); *T. Dan Kolker, Inc. v. Shure,* 209 Md. at 301–02, 121 A.2d at 228–29; *Carozza v. Brannan,* 186 Md. 123, 126, 46 A.2d 198, 199–200 (1946); *Safe Deposit & Trust Corp. v. Woodbridge,* 184 Md. 560, 566, 42 A.2d 231, 233 (1945); *Neidig v. Whiteford,* 29 Md. 178, 185 (1868).

which, INA says, is § 9–201(a) of the Real Property Article. That section reads:

"Any moneys paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any subcontractor, *shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials,* or both, for or about the building, *for purposes of paying those subcontractors.*"

(Emphasis added).

The next step in INA's argument is, to us, unclear. From the statutory reference to moneys "held in trust by the contractor or subcontractor" the argument proceeds to characterizing the moneys paid by Frank to Beck as trust funds in the hands of Genstar. INA tells us that the rule which it contends is applicable is analogous to that set forth in Md. Code (1974, 1991 Repl.Vol.), § 15–204 of the Estates and Trusts Article (ET), a section of the Maryland Uniform Fiduciaries Act. Section 15–204 deals with the liability to the principal on the part of a creditor who is the payee of a check drawn by a fiduciary and used in payment of a personal debt of the fiduciary. Section 15–204 in full reads:

"If a check or other bill of exchange is drawn by a fiduciary or in the name of his principal by a fiduciary empowered to draw the instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of the breach or with knowledge of the facts that his action in taking the instrument amounts to bad faith. If, however, the instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, for the personal benefit of the fiduciary, the creditor or

other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument."

We shall assume, *arguendo,* that this legal principle is, as INA contends, the relevant and applicable rule of law.[5] The rule fails in application here, however, for want of a factual predicate.

The rule reflected in ET § 15–204 requires, *inter alia,* knowledge on the part of the creditor that the payment by the fiduciary is drawn against trust funds. Here, INA has not produced any admissible facts that Genstar knew that Frank was the source of any payments received by Genstar from Beck that were applied by Genstar to invoices other than those for the Hines school project. On this phase of the instant case, the circuit court based its grant of summary judgment in favor of Genstar on this lack of knowledge on Genstar's part.

Restatement (Second) of Trusts § 296 (1959) states the general rule concerning notice of the existence of a trust. That section reads:

"If the trustee transfers trust property in breach of trust to a transferee for value, the transferee takes free of the trust although he has notice of the existence of the trust, unless he has notice that the trustee is committing a breach of trust in making the transfer."

Section 304(2)(a) of Restatement (Second) of Trusts, dealing with satisfaction of an antecedent debt as value, similarly to ET § 15–204, states:

"(2) If the trustee transfers trust property in consideration of the extinguishment in whole or in part of a pre-existing debt or other obligation, the transfer is for value, if

---

5. INA states that the rule embodied in ET § 15–204 codifies the rule in *Swift v. Williams,* 68 Md. 236, 250, 11 A. 835, 838 (1888). In view of INA's position as to the applicable law, we have no occasion to speak to the validity of that comparison.

(a) the trust property transferred is a negotiable instrument or money."

In the context of a construction trust statute these principles were explained in *Sandpiper North Apartments, Ltd. v. American Nat'l Bank & Trust Co.*, 680 P.2d 983 (Okla.1984). There a general contractor claimed against its mechanical subcontractor and the subcontractor's lending bank. The subcontractor had assigned proceeds from the project to the bank, and the general contractor had paid by checks on which the bank and the subcontractor were copayees. The Oklahoma construction trust statute in part provided that "[t]he amount payable under any building ... contract shall, upon receipt by any contractor or subcontractor, be held as trust funds for the payment of all lienable claims...." Okla.Stat. tit. 42, § 152(1) (1971). The contractor sought restitution of progress payments that had not been applied to discharge valid lienable claims, but the bank contended that the statute did not extend fiduciary responsibility to one in its position. In rejecting that argument the court said:

"The Legislature's intent doubtless was that the named recipients be charged with a fiduciary duty over construction funds. The term 'recipient', within the context of these enactments, denotes one who is in control of the trust funds and is thus able to effect their disbursement. The attributes of control make the statutory recipient a *trustee ex lege*. If some person *other than* a statutorily identified recipient is found to have *actually exercised* control over disbursement of *any* money, knowing it to be a part of the trust funds, that person may be regarded *pro tanto* as an involuntary trustee. But the mere fact that one *other than* a statutory trustee is actually able, or has the opportunity, to control the application of some or all trust funds is *alone* insufficient to cast that person in the role of involuntary trustee. The involuntary trustee status may be imposed only on one who knowingly *takes charge* of the trust res, or any of its parts. A lender may thus become liable *qua* trustee of a construction trust res over which it assumed to exercise control and from which money came to be wrong-

fully diverted or misapplied. One who, though not a trustee *ex lege*, stands liable *qua* trustee for misapplied fiduciary funds is known in equity jurisprudence as an involuntary trustee or trustee *de son tort*.[10]

"[10] The terms *de son tort, ex maleficio,* constructive, involuntary or implied trustee are all synonyms. *Davis v. National Bank of Tulsa,* Okl., 353 P.2d 482, 488 [1960]."

680 P.2d at 988 (footnote omitted).

The New York construction trust statute expressly preserves the good faith purchaser defense. N.Y.Lien Law § 72[1] (McKinney 1993); *see also* 1959 Report of the New York Law Revision Commission, *Trust Fund Provisions of the Lien Law, reprinted in* 1959 McKinney's N.Y.Laws 1601, 1610. In a case arising under the New York statute a material supplier contended that the transferee of construction trust assets knew of the trust because the transferor was engaged in the construction business. *Gerrity Co. v. Bonacquisti Constr. Corp.,* 136 A.D.2d 59, 525 N.Y.S.2d 926 (1988). Specifically, the transferee was the contractor's bank which seized funds in the contractor's checking account, pursuant to a loan agreement that was in default. The court reasoned as follows:

"Knowledge that Bonacquisti, as a general contractor, from time to time might have received payments constituting statutory trust funds would not, by itself, establish [the bank's] bad faith, under the general criteria applied to determine what facts or circumstances put a transferee of trust assets on notice (*see, Bonham v. Coe,* 249 App.Div. 428, 434–435, 292 N.Y.S. 423, *affd.* 276 N.Y. 540, 12 N.E.2d 566; Restatement [Second] of Trusts § 297, comment a [1959]; Bogert, Trusts and Trustees § 894 [2d ed. rev.] )."

525 N.Y.S.2d at 929.

Although Genstar knew from its own deliveries that one of the jobs on which Beck was working was the bonded job at the Hines school, that fact alone is insufficient to establish knowledge on the part of Genstar that receipt from Beck of the latter's checks, without direction as to payment, constituted the transfer of trust funds. *Cf. Mountain Home Redi–Mix v.*

*Conner Homes, Inc.,* 91 Idaho 612, 614, 428 P.2d 744, 746 (1967) (supplier put on notice when payments received were attached to copy of invoice); *Lyman Lumber of Wisconsin, Inc. v. Thompson,* 138 Wis.2d 124, 128, 405 N.W.2d 708, 710–11 (1987) (payment made at job site contemporaneous with delivery of materials gave supplier "notice of facts which put him on inquiry as to the source of payment").

In this connection we are persuaded by the reasoning in *American Oil Co. v. Brown Paving Co.,* 298 F.Supp. 528 (D.S.C.1969). That case involved a different rule of law from the one invoked here. In *American Oil* a road building contractor was concurrently performing a number of public works contracts. The payment bond surety for one of the contracts sued the company that supplied materials to the contractor for all of the contracts. The surety invoked a rule applicable to a creditor's allocation of payments, to the effect that

"[i]f the creditor knows, or has reason to know, that the funds out of which the payment was made arose out of advances made on account of a contract covered by a surety's payment bond, [the creditor] is obliged, irrespective of the instructions of the debtor, to credit such payment against accounts connected with that contract."

*Id.* at 534. The court rejected the surety's argument on factual grounds, applying the following rationale:

"Does the mere fact that a creditor knows that some of a debtor's source of funds is from a contract secured by a payment bond amount to constructive knowledge on the part of the creditor that every payment the latter receives is to be deemed to result from the proceeds of that contract? To so hold would mean that, in every case where a debtor is engaged in work under a contract secured by a payment bond, the creditor must, in protection of the surety, assure himself of the source of every payment before giving credit therefor. In the case of a contractor such as Brown, engaged simultaneously on a score or more of public contracts, such a rule would impose on a creditor, who wished

to protect himself as to all payments received, a duty of actually policing the contractor's disbursements. Such exacting scrutiny I do not conceive to be required. Business transactions are not to be thus unreasonably fettered; commercial transactions are not to be so clogged. The true rule seems to me to be that, in the absence of anything appearing to show the source of payment, the creditor is entitled to follow the debtor's instruction as to application. The creditor is not required to make specific inquiries; it is under no duty to investigate the source of the payment before applying the same. Any other rule would really make the materialman, for whose benefit the payment bond is required, become a surety for the surety and would transform the payment bond from a source of protection for the materialman into a snare; it would represent a perversion of the very purpose sought to be achieved by the payment bond."

*Id.* at 538 (citations omitted). Similarly, if the debtor gives no instruction, the creditor should be permitted, without inquiry, to apply a payment to the oldest debt, in accord with the ordinary rule.

For these reasons the circuit court correctly rejected INA's argument that Genstar was violating the construction trust statute when it applied unallocated payments from Beck to Beck's oldest invoices.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.*